No. 8766.

THE STATE OF LOUISIANA EX REL. RUBERA VS. THE BOARD OF LIQUIDATION.

35 753
51 1145

The defendants have authority in law to set up the plea of prescription as effectually as if the same had been raised by the City of New Orleans.

Bonds issued by the City of New Orleans are prescriptible by five years from their maturity.

The Premium Bond Act and the compliance by the City with its provisions, in preparing a list or *ex hibit* of the then outstanding bonds, matured or not, do not constitute an acknowledgment and an interruption of prescription. Even if they did, five years had fully elapsed before the institution of this suit.

The right of action for payment of bonds held to be prescribed cannot be differentiated from one for an exchange of such for other bonds. The decision in 32 An. 1250, (Conger vs. City) affirmed.

APPEAL from the Civil District Court for the Parish of Orleans. Monroe. J.

*Blanc & Butler* for the Relatrix and Appellee.

*Miller & Finney* for Defendants and Appellants.

The opinion of the Court was delivered by

BERMUDEZ, C. J. This is a proceeding by mandamus, to compel the defendants to issue to the plaintiff, in exchange of two New Orleans & Jackson Railroad bonds due on the 1st of March, 1875, of $1,000 each, other bonds for a corresponding amount, known as premium bonds of the City of New Orleans.

The defense is, that the two bonds offered in exchange are not valid obligations of the City, because prescribed by the lapse of five years since their maturity.

The reply to this defense is, that the action is not based on the bonds *for a payment*, but for *an exchange* for other bonds; that the right is not such as can be prescribed against at all; that, even then, the prescription of five years invoked does not apply, and even then, that there has been such an acknowledgment of the right by the State and by the City, that that prescription has been interrupted and remains suspended.

From a judgment in favor of plaintiff, the defendants have appealed.

I.

The objection to the right of the defendants to plead prescription is unfounded. It is claimed that the City *alone* could have set it up, and therefore, that the defendants cannot do so.

The defendants are authorized to fund only such bonds as are due

95

and valid. Where a bond has been paid or extinguished by prescription, it ceases to have any existence.

If it be true that. the bonds in this case exist no more, then the defendants had a right to say so and to establish their objection. If that defense is valid, the unavoidable consequence will be the justification of the resistance.

The bonds were issued by the City of New Orleans, under the provisions of Act 100 of 1854. They are dated March 1st, 1855, and are payable twenty years after their date. They matured on the 1st of March, 1875. This suit was brought on July 3d, 1882, more than five years after their maturity.

## II.

The plaintiff contends that, by reason of the enactment of the law known as the Premium Bond Act, in 1876, No. 31, and of certain acts of the City, prescription has not extinguished the bonds sued on.

The action is on the bonds. If the plaintiff did not hold and own the bonds, no action could lie, either for payment or for exchange. It is only because of that possession and ownership that the plaintiff has a standing in Court and can be heard.

The relator claims that the legislation under which the premium bonds issued, and the acts of the City under it, are a continual acknowledgment of liability for outstanding bonds. He further urges that the City herself has, by her acts and doings, in 1876, in furtherance of the Act and by her subsequent annual levy of taxes to meet those bonds, uninterruptedly admitted her liability, either to pay the bonds declared upon, or to give in exchange thereof the bonds provided for by the Premium Bond Act.

It is not of easy perception how an Act, which has provoked from the highest tribunal in the land, a severe stricture, flavoring of the charge of an attempt at repudiation, can be seriously invoked at this date, as an unqualified acknowledgment of municipal indebtedness. While it is apparent that the object of the legislature of those days was to coerce the funding of all valid outstanding bonds of the City into the premium bond scheme, thus to secure temporary relief to its tax-ridden inhabitants, it is no less evident, that its object was not to pay a solitary copper on any of its outstanding bonds or coupons. This is manifest from the tenor of the seventh section of the Act, which, in revolutionary terms, solemnly forbids the levy of any tax whatever for the purpose of either.

From the most favorable standpoint, that Act can only be viewed as an authority to the City to compromise with her pressing creditors, and to utter, according to a certain scheme or plan, bonds, to be known

as " Premium Bonds," to be given for other outstanding bonds issued by her, and valid at the time of delivery on the compromise.

The new bonds to be given in place of the old ones were designed to extinguish the latter by novation. This clearly results from the pro-: visions of Sec. 9 of the Premium Bond Act, which formally directs that the funded bonds " shall be immediately cancelled by the Commis-· sioners of the Consolidated Debt," and other officials.

When the City complied with the Act, by preparing the premium bonds for the authorized amount, she told her creditors:

" You hold certain bonds of mine, matured and unmatured, on which I do not intend to pay a cent. I propose, however, to give you, in their place, other bonds issued, on long credit, under the Premium. Bond Act, which I have prepared and hold ready." In other words, the City said : " I propose to take up the bonds which you hold, and which I will not pay, provided you give me time, surrender them, and receive in place other bonds of mine having fifty years to run."

It is notorious, that holders of a very large number of the ostracised bonds came forward and accepted the compromise, while many others, among whom the plaintiff, either refused or at least neglected to sub-mit to the exaction.

We fail to perceive how the State or City ever acknowledged the debt which the relator claims was due him in 1876, in consequence of the ownership of the two bonds declared upon, unless it be, that they were specially included in the statement made of bonds outstanding shortly after the adoption of the Act. That statement was not designed to be, and in point of fact was not an acknowledgment of any right of the bondholders, and of any liability on the part of the City, in conse-quence. It is a mere tabular *exhibit*, describing and enumerating the bonds of the City then outstanding.

But, yielding *arguendo* that there was *an* admission which interrupted prescription, how can it be claimed that it is continuous and will indefinitely be such, never to end ?

The acknowledgment, which interrupts prescription, is the recognition of a right, of a debt, of a liability, as it exists at the precise time when the admission is made. Immediately thereafter, prescription begins to run again. It can no more be made so as to be perpetual, (unless it be a pledge) than prescription can be waived before it is acquired. Prac-tically it amounts to that, and this waiver is prohibited.

It has long since been held that a conditional offer to pay, if long time enough was given, did not amount to a new promise and take the, case out of prescription so as to entitle plaintiff to recover. The doc-trine is likewise well established, that where a debt has been due for

a lapse of time necessary to bar it by prescription, and there is no clear and positive evidence to justify the averment of the relinquishment of the right acquired to plead, that plea must prevail. 15 L. 145; 5 An. 335; 9 An. 15; 11 An. 184; Troplong, § 156.

That acknowledgment, if such, was made in 1876, and between that time and the date of institution of this suit, five years have fully elapsed.

### III.

Neither did the Act of 1876, nor the acts of the City under it, have the effect of suspending prescription. The plaintiff seems to consider that, because of the prohibitory clauses to which reference is made, contained in that Act, and perhaps also because of those in Act 5 of 1870, he was prevented from protecting himself against the evil effect of time, and that he is thus shielded by the maxim: *Contra non valentem, non corrit prescriptio*. But this is a mistake. Those prohibitive clauses were avowedly *ab initio* unconstitutional.

They could not, and did not impair the obligations of the contract under which the bonds held by relator were issued. He had a right to sue for the enforcement of his right to tax for payment, as Morris Ranger and others have done on similar bonds, and he had the conferred alternative right on presenting his bonds, to demand premium bonds in return. Prescription does not run against a creditor, when the courts were closed to him, or when, by some extraordinary and unforeseen event beyond his control, he was prevented from acting. What is it that has impeded the relator from asserting his rights since the adoption of the Premium Bond Act, which could not, and therefore did not, impair the obligation of the contract between him and the City? His inaction has served as a solid basis for prescription, and has become an impassable obstruction to the accomplishment of his present object. He could have done, within five years after the alleged acknowledgment, precisely that which he has undertaken to do on the 23d July, 1882, when he brought this proceeding. The laws on this subject, as far as he is concerned, are to-day what they then were and, if at that time they abridged any of his rights and prevented him from acting, and this was good in law, there is no reason why he should not look upon them this day, as he then did, and why this Court should not act likewise.

The relator has slept upon his rights, and cannot overcome the irresistible defense which the law authorizes the City to advance, and which she has mercilessly urged.

State ex rel. Rubera vs. Board.

## IV.

In the case of Conger, 32 An. 1250, we held, that *similar* bonds, of which *payment* was sought, were prescriptible and were prescribed.

It is true that the defenses raised in the present controversy were not there set up, but that is immaterial.

The bonds now declared on are *effects negotiable*, or *transferrable by delivery*," and are clearly embraced within the provisions of Article 3539 of the Revised Code, which emphatically declares that actions on such effects are precribed by five years from the day when the engagements were payable.

We see no reason to alter our views on that subject.

The law does not distinguish between the different sorts of actions which can be brought on such effects, whether for *payment* or *any other purpose*.

It does not discriminate, and where it does not distinguish, we are powerless to do so.

We hold that the bonds declared upon are prescriptible and prescribed; that being prescribed, they have no legal existence; that they do not constitute valid outstanding and fundable obligations of the City of New Orleans, and that there can be no recovery upon them, either for payment or for replacement by other bonds, under the provisions of the Premium Bond Act.

It is, therefore, ordered and decreed that the judgment appealed from be reversed, and it is now ordered, adjudged and decreed that there be judgment for defendants, rejecting the application of relator for the funding of the bonds declared upon, with costs in both Courts.

Fenner, J. concurs, for reasons in his separate opinion.

Justices Todd and Manning concur in the decree.

---

## CONCURRING OPINION.

FENNER, J. My study of this case leads me to the following conclusions:

1. I am unable to appreciate the subtle distinction under which it is contended that, while the bonds may be prescribed as claims for money, as held in the Conger case, they are not prescribed as claims entitled to be funded under the Premium Bond Act. Under our system, prescription is a mode of extinguishing debts. Obviously, the Premium Bond Act contemplates only the funding of *debts* of the City, and if these bonds, though once debts, have been extinguished by prescription, they are no longer *debts*, and are not entitled to be funded.

2. The Premium Bond Act creates no *vinculum juris* between the City and holders of bonds who did not accept its provisions. As to them,

until the moment of acceptance, the Act remained a mere *proposition* in behalf of the City, without effect upon their rights or obligations. Their right to avail themselves of its benefits depended upon their *status* at the moment of acceptance. If, at that moment, their bonds were valid and subsisting obligations of the City, they all would be entitled to fund, otherwise not. I am unable to agree with my brother of the District Court, that the case is affected by the facts that the premium bond scheme is laid out on a scale broad enough to embrace the entire bonded debt existing at its date, that an amount of premium bonds equal to the whole were executed and that a tax was provided and actually levied sufficient for the extinguishment of the whole.

These were necessities of the scheme based upon the contingency that all might accept. But it is undeniable that non-accepting bond-holders acquired no rights in or upon the unissued premium bonds or the taxes levied under the scheme. The unissued bonds remained the property of the City, and the surplus of the tax went to the City, not to be distributed among or held for non-accepting bondholders, but to be employed in reducing the bonded debt by purchase or payment. There is no foundation, therefore, for the idea that the provisions or execution of the premium bond scheme constituted a continuing recognition of the unfunded bonds. If the whole of the unfunded bonds were paid or otherwise extinguished, it would not, at least without further legislation, affect the premium bond scheme.

3. The opinion of another learned District Judge, who has had this question before him, is filed with the brief, in which the position is taken that Act No. 133 of 1880 created a trust in favor of all creditors of the City holding debts valid at that date, against the execution of which the trustee cannot oppose prescription. It might be a sufficient answer to this position to say, that in this case the relator is not seeking the execution of any trust created by that Act. The relief sought is exclusively under the Act No. 31 of 1876, which in express terms was left entirely unimpaired by the Act of 1880.

But, on broader grounds, I can discover no difference in the principles applicable to this Act from those already mentioned as applicable to the Premium Bond Act. It provides for the creation of new bonds and for their exchange for valid obligations of the City, or for their sale and application of the proceeds to the retirement of like valid obligations, and for the application of the surplus of the premium bond tax, in the manner prescribed. But it has no reference to any except subsisting valid obligations, and applies to them only so long as they continue such. Indeed, the Act denounces penalties against the members of the board, in case they should extend its benefits to any

invalid obligation. It is a perversion of the legislative purpose to engraft upon the Act the effect of rendering the obligations of the City imprescriptible.

4. Nothing in any legislation deprived the holders of matured bonds of the power to interrupt prescription by judicial citation, and, therefore, the rule *contra non valentem* has no application.

5. The effect of the statement of recognized liabilities, prepared by the City under the legislative direction found in the Premium Bond Act, needs no discussion, for, admitting its validity as an interruption of prescription, more than five years elapsed between its date and that of the institution of this suit.

Adhering to the principles of Conger vs. City, 32 An. 1250, the relator's bonds are prescribed and afford him no basis for relief.

I, therefore, concur in the decree rendered herein.

Rehearing refused.